## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Delta Financial Corporation, <u>et al.</u>, | ) | Case No. 07-11880 (CSS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |
| Delta Financial Corporation | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 08-50287 (CSS) |
| | ) | |
| Westchester Surplus Lines Insurance | ) | Docket Nos. 24, 27, 30, 34, 41 |
| Company, United States Fire Insurance | ) | |
| Company and Axis Specialty Insurance | ) | |
| Company, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

John E. James
Richard L. Horwitz
Gabriel R. MacConaill
Potter, Anderson & Corroon, LLP
P.O. Box 951
1313 N. Market Street, 6th
Wilmington, Delaware  19899
　　　　- and -
Matthew L. Jacobs (Argued)
Ronald R. Peterson (Argued)
Megan A. Byrnes
Jenner & Block, LLP
601 Thirteenth Street NW
Suite 1200 South
Washington, D.C.  20005


Counsel for Delta Financial
Corporation

Carl N. Kunz, III
Thomas M. Horan
Douglas N. Candeub
Morris James LLP
P.O. Box 2306
Wilmington, Delaware  19899
　　　　- and -
Joseph K. Powers (Argued)
Edward J. Kirk
J. Gregory Lahr
Sedgwick, Detert, Moran
& Arnold, LLP
125 Broad Street, 39th Floor
New York, New York 10004




Counsel for Westchester Surplus
Lines Insurance Company

Kevin F. Brady
Christina Thompson
Marc J. Phillips
Connolly Bove Lodge
& Hutz, LLP
1007 North Orange Street
Wilmington, Delaware 19801
   - and -
Gary P. Seligman (Argued)
Howard Anglin
Wiley Rein LLP
Washington, D.C. 20006

Counsel for Axis Specialty
Insurance Company

Kevin F. Brady
Christina Thompson
Marc J. Phillips
Connolly Bove Lodge
& Hutz LLP
1007 North Orange Street
Wilmington, Delaware 19801
   - and -
Joan M. Gilbride (Argued)
Kaufman, Borgest & Ryan, LLP
200 Summit Lake Drive
Valhall, New York 10595

Counsel for Unites States Fire
Insurance Company

Date: December 15, 2008

Sontchi, J. _____

# INTRODUCTION

This is an action for a declaratory judgment that the defendants are required to provide insurance coverage to the debtors and certain of the debtors' officers and directors for defense costs and indemnification in connection with a pending state court action.

Delta Financial Corporation, the lead Chapter 11 debtor in the underlying bankruptcy cases, and certain of its officers and directors were sued pre-petition in New York state court. The plaintiff in the state court action asserts a number of claims arising from a 2001 restructuring transaction. The plan involved a two-part transaction. First, the unsecured notes and senior secured notes were surrendered to Delta LLC, a newly created entity formed to facilitate the transaction. In exchange, the note holders received certain interests in Delta LLC and its newly formed management company.

Second, in exchange for the surrender of the notes by Delta LLC to Delta Financial, Delta Financial transferred excess "cash flow certificates" that it valued at $153 million to Delta LLC. The parties intended for the value of the cash flow certificates contributed by Delta Financial to equal the outstanding balance of the notes surrendered by Delta LLC, i.e., approximately $153 million. The second restructuring transactions closed in 2001.

The state court action was commenced in 2003 against Delta Financial and certain of its officers and directors. The plaintiffs in that underlying action assert that, at the time of the closing of the second restructuring transactions, the cash flow certificates were not worth the value attributed to them by Delta Financial, i.e., $153 million, but, rather, they had a fair market value that was $110 million lower. Immediately after the commencement of the state court action, Delta Financial notified the insurers under its primary and two excess D&O policies of the litigation and made a demand for defenses costs and indemnification. The insurance policies contained a provision excluding claims for "Loss on account of any Claim made against any Insured: … based upon, arising out of, or attributable to the actual . . . payment by the Company of allegedly inadequate . . . consideration in connection with the Company's purchase of securities issued by any company." Chiefly based upon this exclusion, the primary insurer denied coverage, arguing that the claims asserted in the state court action arose from Delta Financial issuing cash flow certificates worth less than $153 million in connection with Delta Financial's purchase of its own unsecured notes and senior secured notes.

In December 2007, Delta Financial and its affiliates filed Chapter 11. Shortly thereafter, Delta Financial commenced this adversary proceeding, seeking a declaration that the insurers are required to provide coverage for defense costs and indemnification in connection with the pending state court action. In addition, Delta Financial seeks compensatory and punitive damages related to the primary insurer's denial of coverage. The defendants have moved to dismiss the complaint. The primary argument asserted by the defendants is that coverage is unavailable because of the "inadequate consideration" exclusion under the policies.

Under the applicable law, the court must apply the "but for" test to determine whether the exclusion applies. In so doing the Court must determine the specific type of harm or damage plaintiffs in the state court action claim to have suffered; what specific "operative act" brought about the alleged harm based upon the alleged facts and without reference to plaintiffs' theories of liability; and whether the operative act is explicitly covered by the exclusion. If the operative act is explicitly covered by the exclusion then the clause will exclude any claims that *only* arise because of that act.

The operative act that brought about the alleged harm was the exchange of the notes worth $153 million for cash flow certificates worth $110 million less. All the claims asserted against the defendants in the state court action arose from the operative act of the exchange and are excluded from coverage. Thus, the insurers are not required to provide coverage for defense costs and indemnification in connection with the pending state court action.

As all of claims asserted by Delta Financial in this action are based upon the assumption that the exclusion is inapplicable, the Court will grant the motion to dismiss in its entirety.

## JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. §1334. Venue of this proceeding is proper in this district under 28 U.S.C. §§1408 and 1409. Whether this is a core proceeding under 28 U.S.C. §157(b) is subject to a pending motion and is discussed below.[1]

## NATURE AND STAGE OF THE PROCEEDINGS

In February, 2008, Delta Financial Corporation, a debtor in possession in the underlying Chapter 11 cases pending before the Court ("Delta Financial"), commenced this adversary proceeding by filing a Complaint against: (1) Westchester Surplus Lines Insurance Company ("Westchester"); (2) United States Fire Insurance Company ("U.S. Fire"); and (3) Axis Specialty Insurance Company ("Axis" and, collectively with Westchester and U.S. Fire, the "Insurers"). Delta Financial seeks declaratory relief and damages under a policy issued by Westchester (the "Policy") as well as two "follow-form" excess policies issued by U.S. Fire and Axis.[2] More specifically, Delta Financial

---

[1] See pp. 42-45, infra.

[2] Delta Financial purchased for Westchester a Management Protection Insurance Policy that included a Directors, Officers and Company Securities Liability Coverage Part, pursuant to which Delta Financial is named insured. The limit of liability for each separate Insuring Clause of the Policy is at least $5 million.

In addition, Delta Financial purchased (i) from Axis a "SecurExcess" Excess Insurance Policy; and (ii) from U.S. Fire an Excess Liability Insurance Policy, under both of which Delta Financial is named insured. These latter policies are commonly known in the insurance industry as "follow form" policies, meaning that both policies mirror the terms and conditions of the Policy. The limit of liability of each of the excess policies issued by Axis and the U.S. Fire is $5 million, for a total of $10million.

seeks a declaratory judgment that the Insurers are required to provide coverage for defense costs and indemnification in connection with a pending state court against Delta Financial and its officers and directors. That action is pending in the Supreme Court of the State of New York for Nassau County and is captioned *Delta Funding Residual Exchange Co., LLL, et al. v. Delta Financial Corp., et al.*, Index No. 003084/2004 (the "Underlying Action"). In addition, Delta Financial seeks compensatory and punitive damages related to Westchester's denial of coverage under the Policy.

Westchester filed an answer and a demand for a jury trial. In addition, Westchester filed a motion for determination that this adversary proceeding is a non-core proceeding as well as a motion requesting the district court to withdraw the reference of this adversary proceeding.[3] That same day, U.S. Fire and Axis each filed a motion to dismiss the Complaint under Fed.R.Bankr.P. 7012(b)(6). Subsequently, Westchester filed a motion for judgment on the pleadings under Fed.R.Bankr.P. 7012(c). This matter is now ripe for decision.

## STATEMENT OF FACTS[4]

### I.    The Transactions

### A.    First Restructuring

In August 2000, Delta Financial restructured its debt by offering holders of certain unsecured senior notes ("Senior Notes") the opportunity to exchange those

---

[3] U.S. Fire and Axis joined in these motions.

[4] The Statement of Facts is based upon the Complaint in this case and the exhibits thereto, including the Second Amended Complaint in the Underlying Action. *Sands v. McCormick*, 502 F.3d 263, 268 (3rd Cir. 2007) ("Generally, in ruling on a motion to dismiss, a district court relies on the complaint, attached exhibits, and matters of public record.").

notes for secured 9 ½ percent senior secured notes ("Senior Secured Notes") and warrants for Delta Financial common stock. The Senior Secured Notes were secured by excess cash flow certificates held by Delta Financial and its affiliates. Delta Financial was in the business of originating and creating securitizations of the home mortgages it originated. Interests in the securitized pools of mortgages were then sold to investors. The excess cash flow certificates entitled their holder to cash payments if the return on the securitized pools of mortgages exceeds the amount due to investors. Most holders of the Senior Notes accepted this offer.

### B. Second Restructuring

Within a few weeks of closing the first restructuring, Delta Financial informed the holders of the Senior Secured Notes that it could not meet its obligations to them. Delta Financial stated that bankruptcy was likely because of: mortgage delinquencies; the high servicing costs of its mortgage portfolios; diminishing ability to make interest payments on the Senior Notes and Senior Secured Notes; and low corporate ratings by Moody's and Fitch. In an attempt to avert bankruptcy, Delta Financial proposed a second restructuring plan and advised the holders of the Senior Notes and Senior Secured Notes, which collectively held approximately $150 million in debt, that Delta Financial would file bankruptcy unless the note holders accepted the new plan.

The plan, which involved another exchange offer, is described in : (a) the Registration Statement (Form S-4), which was filed with the Securities and Exchange Commission on May 4, 2001, as amended (the "Registration Statement"); (b) the Preliminary Prospectus, dated May 3, 2001, as amended, and as defined in section 4.5 of

the Exchange Agreement (defined below) (the "Preliminary Prospectus"); and (c) the Prospectus dated August 28, 2001 (the "Prospectus"). Collectively, these documents are referred to as the "Offering Documents." The plan was ultimately consummated through the "Exchange Agreement" – a reorganization and exchange agreement, dated as of August 23, 2001, among Delta Funding Residual Exchange Company, LLC ("Delta LLC"), Delta Financial and two of Delta Financial's affiliates.

Delta Financial proposed to effect the second restructuring by transferring assets that it represented would have an initial value of at least $150 million to Delta LLC. The note holders, who collectively held approximately $150 million in Senior Notes and Senior Secured Notes, would exchange those notes for interests in Delta LLC. In addition, the note holders were to receive new preferred Delta Financial stock with an aggregate liquidation preference amount valued by Delta Financial at $15 million. The Offering Documents stated that the intent of the parties was that "the cash and the fair market value of the preferred stock and other assets received in the exchange will approximately equal the outstanding balance of the notes surrendered."

The transferred assets were to consist primarily of certain excess cash flow certificates under mortgages previously originated and securitized by Delta Financial (the "Contributed Cash Flow Certificates"). The Contributed Cash Flow Certificates entitled their owners to cash payments if the return on the mortgages underlying the securitized pools exceeded the amount due the investors. The Offering Documents stated that Delta Financial valued the Contributed Cash Flow Certificates at $153

million. The financial statements of Delta Financial incorporated in the Offering Documents also reflected this value.

The Offering Documents further provided that: (a) $153 million was a fair valuation of the Contributed Cash Flow Certificates based on the various assumptions and criteria set out in the Offering Documents; (b) Delta Financial was required to "mark to market the excess cash flow certificate on a regular basis by making an adjustment to [Delta Financial's] interest income;" and (c) Delta Financial "continually reviewed [its] prepayment assumptions in light of [its] own and industry experience and ma[d]e adjustments to those assumptions as needed." Delta Financial also represented and warranted to Delta LLC in the Exchange Agreement that neither the Registration Statement nor the Prospectus "contain an untrue statement of a material fact or omit to state a material act required to be stated therein or necessary to make the statements therein not misleading."

To facilitate the second restructuring plan, Delta LLC and its managing member, Delta Funding Residual Management, Inc. ("Management, Inc."), were formed in June 2001. Delta LLC was "created to facilitate the exchange offer." It was not to conduct any business and its sole purpose was to hold mortgage related securities previously held by Delta Financial and its affiliates. Delta Financial was initially the sole member of Delta LLC and had "sole responsibility for managing the business and affairs of [Delta LLC]." Delta Financial was required to maintain the books of account with respect to the operations of Delta LLC and to manage the assets of Delta LLC "with the

same degree of care and skill as Delta Financial would use it owned such assets directly."

From the formation of Management, Inc. and Delta LLC in June until October, Messrs. Hugh Miller, Marc E. Miller and Richard Blass (the "Delta LLC Directors"), who were officers and/or directors of Delta Financial, were also officer and directors of Management, Inc. and officers of Delta LLC. One or more of them executed the Offering Documents as well as the Exchange Agreement on behalf of Delta LLC.

The second restructuring transaction closed on August 29, 2001, pursuant to, and in reliance upon, the Offering Documents and the various agreements, dated as of August 23, 2001, including the following: (a) the Exchange Agreement; (b) a Management Agreement between Delta LLC, Management, Inc. and Delta Financial, and (c) an Amended and Restated Limited Liability Company Agreement between the former note holders, Management, Inc. and Delta Financial, as subsequently amended (the "Operating Agreement").

In the first step of the transaction, the note holders contributed their Senior Notes and/or Senior Secured Notes to Delta LLC in exchange for Class A voting Membership Interests in Delta LLC and stock interests in Management, Inc. The non-voting Class B and Class C Members Interests were held by Management, Inc. and Delta Financial, respectively. In the second step of the transaction, Delta LLC surrendered the Senior Notes and Senior Secured Notes to Delta Financial in exchange for the Contributed Cash Flow Certificates and other assets.

### C.    Devaluation of the Contributed Cash Flow Certificates

Plaintiffs allege that, at the time of closing, the Contributed Cash Flow Certificates had a fair value far below the $153 million stated in the Offering Documents and that the defendants knew or should have known that the represented value was grossly overstated.

The Delta LLC Directors continued in their roles with Management, Inc. and Delta LLC until October 26, 2001, at which time an outside, independent chief executive officer, James E. Morrison, was appointed to run Management, Inc. and Delta LLC.  In mid-November, 2001, shortly after taking office, Mr. Morrison met with executives of Delta Financial.  During that meeting, Delta Financial advised Delta LLC for the first time that Delta Financial had recently devalued its retained excess cash flow certificates. Delta LLC later learned that, as of September 30, 2001, Delta Financial had devalued the retained excess cash flow certificates by the 60% noted above.  In mid-December, 2001, Delta Financial delivered to Delta LLC, for the purpose of inclusion in Delta LLC's quarterly statement, a balance sheet as of September 30, 2001, showing that the retained excess cash flow certificates had a value of just over $60 million on that date.

### II.  Plaintiffs' Allegations in the Underlying State Court Action

The Underlying Action was filed by Delta LLC and Management, Inc. against Delta Financial and five of its directors, including the Delta LLC Directors (collectively, the "Individual Defendants").  In the Underlying Action, plaintiffs assert eight causes of action related to the second restructuring plan.

First, plaintiffs allege that Delta Financial breached the Exchange Agreement. Specifically, plaintiffs allege that Delta Financial agreed in the Offering Documents to contribute assets to Delta LLC "approximately equal to the outstanding balance of the notes surrendered." And, Delta Financial further stated that the value of the Contributed Cash Flow Certificates was $153 million. Plaintiffs further allege that the value of the Contributed Cash Flow Certificates was far less than $153 million and Delta Financial's valuation of the certificates and the statements supporting that value were either untrue or failed to state a material fact. Accordingly, Delta LLC suffered a loss of approximately $110 million, which is the difference between the actual value of the Contributed Cash Flow Certificates and the value Delta Financial gave them. This loss leads to the alleged breach of the Exchange Agreement, not because of the actual loss, but because Delta Financial has failed to fulfill its obligation under the Exchange Agreement to indemnify and hold harmless Delta LLC against this loss. Specifically, plaintiffs assert that Delta Financial has breached the Exchange Agreement by failing to indemnify plaintiffs:

> from and against any and all losses, claims, damages, liabilities and expenses caused by any untrue statement, or alleged untrue statement of a material fact contained in the Registration Statement, any Preliminary Prospectus, or the Prospectus or any amendment or supplement thereto, or any other disclosure document or other public statement, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statement therein not misleading.

As a result, plaintiffs seek compensatory damages of approximately $110 million plus fees and costs against Delta Financial in favor of plaintiffs.

Second, plaintiffs allege Delta Financial breached the Management Agreement. Plaintiffs assert that the Management Agreement required Delta Financial to manage Delta LLC's assets and keep its books and records with the same degree of skill and care it would exercise if owned the assets directly. Plaintiffs allege that Delta Financial breached this obligation by failing to timely notify Delta LLC that Delta Financial had devalued comparable excess cash flow certificates owned by Delta Financial. As a further breach of the Management Agreement, plaintiffs allege that Delta Financial effectively refused to value the Contributed Cash Flow Certificates, which was necessary for Delta LLC to produce its interim and year-end reports and filings. As a result, plaintiffs seek compensatory damages of approximately $500,000 plus fees and costs against Delta Financial in favor of plaintiffs.

Third, plaintiffs allege that the Individual Defendants committed fraud. Plaintiffs allege that the Individual Defendants knew, as of August, 2001, that valuing the Contributed Cash Flow Certificates at $153 million was a gross overstatement. In the alternative, plaintiffs allege that the Individual Defendants' representations as to the value of the Contributed Cash Flow Certificates were made with reckless disregard for the truth or falsity of those statements.

The plaintiffs further allege that these misrepresentations made by the Individual Defendants and Delta Financial, which was under the control of the Individual Defendants, were (1) made for the Individual Defendants' personal gain and to further personal interests; and (2) made with the intention that Delta LLC for itself and its members rely upon them by surrender the Senior Notes and the Senior Secured Notes

to Delta Financial for assets that were represented by the Individual Defendants and Delta Financial to be approximately equal to the outstanding balance of the surrendered notes. Finally, plaintiffs allege that Delta LLC reasonably relied on these misrepresentations in surrendering the notes. Thus, based upon the alleged fraud, plaintiffs seek compensatory damages of approximately $110 million plus fees and costs as well as punitive damages against the Individual Defendants, jointly and severally, in favor of Delta LLC.

Fourth, plaintiffs allege that the wrongful actions in Counts 1 through 3 of the Second Amended Complaint in the Underlying Action have triggered Delta LLC's right under the Operating Agreement to redeem the Delta LLC Class C Membership Interests held by Delta Financial because "(a) [Delta Financial] has failed to meet its obligations under the Exchange Agreement and (b) [Delta Financial's] actions and omissions have materially and adversely affected Delta LLC." Plaintiffs further allege that Delta Financial does not agree that Delta LLC may redeem the interests and, thus, seeks a declaratory judgment that Delta LLC has such a right.[5]

Fifth, plaintiffs allege that Delta Financial and the Individual Defendants negligently misrepresented to Delta Financial that the value of the Contributed Cash Flow Certificates was $153 million. Plaintiffs seek compensatory damages of approximately $110 million plus fees and costs against Delta Financial and the Individual Defendants, jointly and severally, in favor of plaintiffs.

---

[5] Plaintiffs do not seek any damages under the fourth count of the Second Amended Complaint.

Sixth, plaintiffs assert an anticipatory breach of the Exchange Agreement for Delta Financial's failure to indemnify and hold harmless Delta LLC for any loss stemming from any untrue statement or allegedly untrue statement contained in any of the documentation associated with the second restructuring transaction. Delta LLC argues that the Exchange Agreement requires Delta Financial to reimburse Delta LLC for its costs in connection with the Underlying Action, including its reasonable attorneys' fees, as they are incurred. Plaintiffs further assert that, based upon Delta Financial's prior conduct in connection with the dispute, Delta Financial will fail to honor its obligation to reimburse Delta LLC for its attorneys' fees. As a result of the alleged anticipatory breach, plaintiffs seek entry of an interim order requiring Delta Financial to pay the plaintiffs' attorneys' fees in the Underlying Action. In the alternative, plaintiffs seek entry of a judgment after trial for payment of Delta LLC's payment of attorneys' fees incurred in the Underlying Action against Delta Financial in favor of Delta LLC.

Seventh, plaintiffs assert claims against the Delta LLC Directors for breach of their fiduciary duties as officers and/or directors of Delta LLC and Management, Inc. Plaintiffs assert that the Delta LLC Directors breached their fiduciary duties of care, good faith and loyalty by allowing the second restructuring transaction to proceed to closing while knowing that the value of the Contributed Cash Flow Certificates had been misrepresented. Plaintiffs seek compensatory damages of approximately $110 million plus fees and costs against the Delta LLC Directors, jointly and severally, in favor of Delta LLC.

Eighth, plaintiffs assert a claim for breach of fiduciary duty against Delta Financial. Prior to the execution of the Management Agreement and the Operating Agreement, Delta Financial had the sole responsibility for managing the business and affairs of Delta LLC. Thus, Delta Financial owed fiduciary duties to Delta LLC. Following the execution of the Management Agreement and Operating Agreement, Delta Financial became responsible for managing Delta LLC on behalf of Management, Inc. In this role Delta Financial agreed to manage Delta LLC's assets with the same degree of care as it would manage its own assets, and it continued to owe Delta LLC fiduciary duties and, thus, plaintiffs assert that Delta Financial owed Delta LLC the fiduciary duties of care, good faith and loyalty. Plaintiffs assert that Delta Financial breached those fiduciary duties by allowing the second restructuring transaction to close, despite the fact that Delta Financial knew the value of the Contributed Cash Flow Certificates was grossly overstated and knew that Delta Financial's representations as to the method of valuing the Contributed Cash Flow Certificates were false, materially misleading or both. Plaintiffs seek compensatory damages of approximately $110 million plus fees and costs against Delta Financial in favor of Delta LLC.

### III. The Insurance Policies

#### A. The Policies

Delta Financial purchased from Westchester the Policy, pursuant to which Delta Financial is the named insured. The Policy contains three insuring clauses, which combine to provide coverage to Delta Financial and its officers and directors for "Loss" arising from "Claims" alleging "Wrongful Acts." Absent the applicability of any

exclusions, the claims asserted by the plaintiffs in the Underlying Action would be covered by the Policy.[6]

### B.    The Request For Coverage and Denial of Same

In September, 2003, Delta Financial provided Westchester with notice of the Underlying Action and Delta Financial's choice of counsel.  One week later, Westchester sent Delta Financial a letter acknowledging receipt of the notice and stating that Westchester was in the process of establishing a claims file and submitting the claim for an initial review.  There was no reservation of rights and no indication that Delta Financial's claim would be denied.  Throughout 2003 and 2004, Delta Financial sent several letters to Westchester keeping it advised of the status of the Underlying Action.

Westchester sent a second letter to Delta Financial in October, 2004, advising Delta Financial that Westchester was still in the process of establishing a claims file and reviewing the submitted information.  Westchester stated in the letter that it would notify Delta Financial once the "initial review" was completed.  The letter contained neither a reservation of rights nor an indication that Delta Financial's claim would be denied.  In April, 2005, almost 18 months after Delta Financial's initial notice letter, Westchester denied coverage for the Delta LLC action.

Westchester has relied on a number of exclusions under the Policy in denying coverage for the Underlying Action.  First and foremost, Westchester relies on Exclusion

---

[6] The Insurers argue that the claims asserted by the plaintiffs in the Underlying Action do not meet the definition of "Loss" under the Policy.  See pp. 20-21, infra.  The Court need not address that argument as it is unnecessary to dispose of the motions.  See n. 71, infra.

A(12), as amended by Endorsement No. 13 (the "Inadequate Consideration Exclusion").[7]

## IV. The Adversary Proceeding

In February, 2008, Delta Financial commenced this adversary proceeding against the Insurers. Delta Financial seeks a declaration that the Insurers are required to provide coverage for defense costs and indemnification in connection with the pending state court action. In addition, Delta Financial seeks compensatory and punitive damages related to Westchester's denial of coverage.

More specifically, Delta Financial asserts nine causes of action. First, Delta Financial seeks a declaratory judgment that Westchester owes Delta Financial a duty to advance or reimburse it for the Defense Costs (as defined in the Policy) that it has incurred and continues to incur to indemnify the Individual Defendants in the Underlying Action.

Second, Delta Financial seeks a declaratory judgment that (i) Westchester owes the Individual Defendants a duty to advance or reimburse them for the Defense Costs that they have incurred and continue to incur in the Underlying Action and any future Loss in an amount of at least $5 million; and (ii) the claims of the Individual Defendants for Defense Costs or Loss must be paid first.

---

[7] This provision provides that:

> [t]he insurer shall not be liable for Loss on account of any Claim made against any Insured: … based upon, arising out of, or attributable to the actual or proposed payment by the Company of allegedly inadequate or excessive consideration in connection with the Company's purchase of securities issued by any company.

Third, Delta Financial seeks a declaratory judgment that (i) Westchester owes Delta Financial a duty to advance or reimburse Delta Financial for the Defense Costs that it has incurred and continues to incur in the Underlying Action and any future Loss in an amount of at least $5 million.

Fourth, Delta Financial asserts a breach of contract claim against Westchester for Westchester's allegedly wrongful denial of coverage under the Policy. Delta Financial seeks compensatory damages of approximately $4 million.

Fifth, Delta Financial asserts a claim for breach of the covenant of good faith and fair dealing against Westchester. Delta Financial alleges that Westchester unreasonably and in bad faith failed to timely issue a coverage position by waiting 18 months to decide to deny coverage under the Policy even though Westchester was in possession of sufficient facts and information to make that decision. Delta Financial also alleges that it reasonably relied on Westchester's silence by incurring fees and costs in connection with the Underlying Action with the expectation it would be afforded full coverage under the Policy. Delta Financial seeks punitive damages and pre-judgment interest under this count.

Sixth, Delta Financial seeks a declaratory judgment that, in the event that the amount of any Loss or Defenses Costs exceed the limits of the Policy, U.S. Fire owes Delta Financial a duty (i) to advance or reimburse Delta Financial for the Defense Costs that it has incurred and continues to incur in the Underlying Action; and (ii) to indemnify Delta Financial for any future Loss.

Seventh, Delta Financial seeks a declaratory judgment that (i) U.S. Fire owes the Individual Defendants a duty to advance or reimburse them for the Defense Costs that they have incurred and continue to incur in the Underlying Action and any future Loss; and (ii) the claims of the Individual Defendants for Defense Costs or Loss must be paid first.

Eighth, Delta Financial asserts against Axis the same claims that it asserts against U.S. Fire in Count 6.

Ninth, Delta Financial asserts against Axis the same claims that it asserts against U.S. Fire in Count 7.

In connection with each request for declaratory judgment, Delta Financial also seeks a declaratory judgment that no exclusions apply to preclude coverage for defense of the Underlying Action.  Finally, under each count, Delta Financial requests an award of fees and costs in connection with bringing the adversary proceeding.

## V.  The Motions

Westchester has asserted six arguments in favor of its motion for judgment on the pleadings.  Westchester asserts that: (i) the requests for declaratory judgment should be dismissed because the Inadequate Consideration Exclusion applies and, thus, there is no coverage under the Policy; (ii) the requests for declaratory judgment should be dismissed because plaintiffs in the Underlying Action are merely seeking restitution of ill-gotten gains, which are uninsurable as a matter of New York law, and, therefore, the claims by Delta Financial are excluded form the definition of Loss under the Policy; (iii) the claim that because of Westchester's delay in denying coverage it is estopped from

asserting that the exclusions and definition of "Loss" are applicable should be dismissed because Delta Financial has failed to assert facts sufficient to establish the elements of equitable estoppel; (iv) the claim that because of Westchester's delay in denying coverage it waived its right to assert the exclusions and definition of "Loss" are applicable should be dismissed because an insurer cannot waive a defense to coverage; (v) the claim for breach of the duty of good faith and fair dealing should be dismissed because there is no such cause of action for an insurer's bad faith refusal to defend or indemnify under and insurance policy and, even if such a claim is cognizable, Westchester's alleged actions are insufficient to support a claim for punitive damages; and (vi) the claim for attorneys' fees must be dismissed because Delta Financial has failed to assert sufficient facts to establish the applicability of either of the two limited exceptions to the general rule under New York that insured persons are not entitled to recover attorneys' fees expended in establishing the right to coverage.[8]

## LEGAL DISCUSSION

### I. Applicable Standards

#### A. Motion to Dismiss Under Rule 12(b)(6)

A motion under Rule 12(b)(6) serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[9] "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations

---

[8] U.S. Fire and Axis join in Westchester's arguments and assert additional arguments on their own behalf. Primarily they assert that since the policy limits under Westchester's policy have not been met the claims against U.S. Fire and Axis are not ripe.

[9] *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir. 1993).

must be enough to raise a right to relief above the speculative level."[10]   In deciding a motion to dismiss, the Court must "accept all factual allegations in the complaint as true."[11]   In addition, the Court will "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[12]   Furthermore, "[t]he issue is not whether a plaintiff will ultimately prevail but whether he or she is entitled to offer evidence to support the claims."[13]

### B.    Motion for Judgment on the Pleadings Under Rule 12(c)

There is no material difference between a motion to dismiss under 12(b)(6) and a motion for judgment on the pleadings under 12(c).[14]  Therefore:

> [A]s with a Rule 12(b)(6) motion, this Court "view[s] the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the plaintiff."  That is, the motion should not be granted "unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law."[15]

---

[10] *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964-1965 (2007).

[11] *Winer Family Trust v. Queen,* 503 F.3d 319, 327 (3d Cir. 2007).

[12] *Sands v. McCormick*, 502 F.3d 263, 267-268 (3d Cir. 2007) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir.2002)).

[13] *Ballentine v. U.S.*, 486 F.3d 806, 810 (3d Cir. 2007) (quoting *Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 187 (3d Cir.2003)).

[14] *Spruill v. Gillis*, 372 F.3d 218, 223 n. 2 (3d Cir. 2004) ("Strictly speaking, the motion acted on by the District Court should not have been captioned as a Fed.R.Civ.P. 12(b)(6) motion to dismiss, but rather as a Fed.R.Civ.P. 12(c) motion for judgment on the pleadings . . . There is no material difference in the applicable legal standards . . .") (internal citations omitted).

[15] *Mele v. Federal Reserve Bank of New York*, 359 F.3d 251, 253 (3d Cir. 2004) (internal citations omitted).

## C.    Contract Interpretation

The applicable rules governing contract interpretation start with plain meaning. Under New York law,[16] "[w]hen interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized."[17] The starting point in gleaning the parties' intent is the plain meaning of the contract's terms.

> Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used. Finally, where the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument.[18]

## D.    Interpretation of Language in General

The search for "plain meaning" is not limited to contract interpretation.  For example, the Supreme Court has often reiterated that the starting point of statutory analysis is the plain meaning of the text of the statute, recently observing that "when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms."[19] In addition, Courts often apply "plain meaning" in interpreting language contained in a

---

[16] New York has the "most significant relationship" to the Policy and the claims asserted in the Complaint. *See Koken v. GPC Int'l, Inc.*, 443 F.Supp.2d 631, 634-35 (D. Del. 2006) (applying most significant relationship test to determine New York law applied to insurance coverage dispute).  Thus, New York law governs.

[17] *Joseph v. Creek & Pines, Ltd.,* 629 N.Y.S.2d 75  (N.Y. App. Div. 1995).

[18] *Fetner v. Fetner,* 741 N.Y.S.2d 256, 258 (N.Y. App. Div. 2002) (internal citations omitted).

[19] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)) (internal citations omitted).

number of documents such as wills, deeds, easements, restrictive covenants, court rules, regulations, and court decisions.[20]   Indeed, "plain meaning" is the starting point for interpreting all language being analyzed by a court, including that contained in complaints.[21]

## II.   Coverage Is Barred By the Inadequate Consideration Exclusion

The Inadequate Consideration Exclusion states that:

> [t]he insurer shall not be liable for Loss on account of any Claim made against any Insured: … based upon, arising out of, or attributable to the actual or proposed payment by the Company of allegedly inadequate or excessive consideration in connection with the Company's purchase of securities issued by any company.

"Under New York law, an insurer seeking to invoke an exclusion clause to disclaim coverage bears the substantial burden of demonstrating that the allegations of the underlying complaint are 'solely and entirely' within the policy exclusion."[22] "To negate coverage by virtue of an exclusion, an insurer must establish that [it] is stated in clear and unmistakable language, is subject to no other reasonable

---

[20] See, e.g., *In re Estate of Cardoso*, 860 N.Y.S.2d 836, 840 (N.Y. Sur. Ct. 2008) (applying plain meaning to will); *Mullinnix LLC v. HKB Royalty Trust*, **1**26 P.3d 909, 919 (Wyo. 2006) (applying plain meaning to deed); *The Drees Co., Inc. v. Thompson*, 868 N.E.2d 32, 40 (Ind. App. 2007) (applying plain meaning to grant of easement); *In re Eastport Golf Club*, **Inc.**, 373 B.R. 446, 450-451 (Bankr. D.S.C. 2007) (applying plain meaning to restrictive covenant); *Impounded*, 277 F.3d 407, 413 (3d Cir. 2002) (applying plain meaning to Rule 6(A)(1) of the Federal Rules of Criminal Procedure); *Strozyk v. Norfolk Southern Corp.*, 358 F.3d 268, 273 (3d Cir. 2004) (applying plain meaning of federal regulation relating to safety of railroad crossings); and *Coalition to Save Our Children v. State Bd. of Educ. of State of Del.*, 90 F.3d 752, 785 (3d Cir. 1996) (applying plain meaning to court order).

[21] But see Frank H. Easterbrook, *Text, History, and Structure in Statutory Construction*, 17 Harv. J.L. & Pub. Pol'y 61, 67 (1994) ("I want to reemphasize what should be obvious.  'Plain meaning' as a way to understand language is silly.  In interesting cases, meaning is not 'plain'; it must be imputed; and the choice among meanings must have a footing more solid than a dictionary – which is a museum of words, an historical catalog rather than a means to decode the work of legislatures.").

[22] *U.S. Underwriters Ins. Co. v. Zeugma Corp.*, 1998 WL 633679, *2 (S.D.N.Y. Sept. 15, 1998).

interpretation, and applies in the particular case."[23] "[W]henever an ambiguity is found in the provisions of an insurance policy, any doubt about the existence of insurance coverage should be resolved in favor of the insured."[24]

New York courts apply a "but for" analysis to interpret words such as "arising out of" contained in insurance exclusion clauses.[25] Specifically, an exclusion applies, even as to claims not directly based on the subject of the exclusion, if the claim would not have arisen "but for" the thing excluded.[26]

### A. The "But For" Test

The "but for" test is an element of the law of causation. The law of causation is an important – but difficult - area of tort law.[27] Causation determines who should be liable for injuries sustained and under what circumstances.[28] Because causation has many meanings – including scientific, philosophical and logical meanings – the law must decide which meaning controls for purposes of imposing tort liability.[29] In order for a defendant to be liable for the plaintiff's injury, the "but for" test requires the plaintiff to demonstrate that, at the very least, the injury would not have occurred "but-for" the act.[30]

---

[23] *Id.*

[24] *Id.*

[25] *Mount Vernon Fire Ins. Co. v. Creative Housing Ltd.*, 88 N.Y.2d 347, 350-51 (N.Y. 1996).

[26] *Id.*

[27] 14 N.Y. Prac., New York Law of Torts § 8.1 (2008).

[28] *Id.*

[29] *Id.* at § 8.3.

[30] *Wolfe v. Samaritan Hosp.*, 484 N.Y.S.2d 168, 171 (N.Y. App. Div. 1984).

Most plaintiffs have no difficulty in proving "but for" causation, but difficulties may arise if there are other plausible variables and factors that could have caused the accident. The New York Court of Appeals has held that plaintiffs need not positively exclude every other possible cause of the accident.[31] Rather, the proof must render those other causes sufficiently "remote" or "technical" to enable the jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence.[32] A plaintiff need only prove that it was "more likely" or "more reasonable" that the alleged injury was caused by the defendant's negligence than by some other agency.[33]

### B. Application Of The "But For" Test To Insurance Coverage

New York courts have applied the "but for" test in cases where insurance companies decline to indemnify defendants on the theory that an exclusion clause in the defendant's insurance policy exempts the insurers from covering the type of accident that has injured the plaintiff. In all of these cases, the exclusion clause contains the phrases "based upon" or "arising out of."[34] Based on these facts, courts ask if a cause of action would not exist "but for" the subject of the exclusion.[35] If so, the exclusion

---

[31] *Gayle v. City of New York*, 680 N.Y.S.2d 900 (1998).

[32] *Id.*

[33] *Id.*

[34] *Mount Vernon*, supra, at 350-51.

[35] *Id.*

applies.[36]  Crucial to the analysis is that the act giving rise to liability, i.e., the "operative act"),[37] is determinative, not the theories of liability alleged.[38]

The leading case on point is *Mount Vernon Fire Ins. Co. v. Creative Housing Ltd.*  In that case, the underlying negligence action was premised on an assault that took place inside a building.  The victim of the assault commenced an action against the owner of the building alleging negligent supervision, management and control of the premises.  Although the owner sought a defense and indemnification from its insurer, coverage was declined on the basis of an exclusionary clause providing that "no coverage shall apply under this policy for any claim, demand or suit based on Assault and Battery."  The Court found that,

> [T]he language of the policy controls . . . and while the theory pleaded may be the insured's negligent failure to maintain safe premises, the operative act giving rise to any recovery is the assault.  While the owner's negligence may have been a proximate cause of plaintiff's injuries, that only resolves its liability; it does not resolve the insured's right to coverage based on the language of the contract between him and the insurer.  Merely because the owner might be found liable under some theory of negligence does not overcome the policy's exclusion for injury resulting from assault.[39]

Courts have applied *Mount Vernon's* reasoning to cases involving (1) property damage due to the acts of an independent contractor,[40] (2) personal injuries resulting

---

[36] *Id.*; see also *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 623 n. 15 (2d Cir. 2001) ("only if the . . . injury suffered by [plaintiff] would not exist *but for* the breach of contract, would the [exclusion clause apply].") (emphasis in original).

[37] *Id.*  at 351-52.

[38] *U.S. Fire Ins. Co. v. New York Marine and General Ins. Co.*, 268 A.D.2d 19, 23 (N.Y. App. Div. 2000).

[39] *Mount Vernon*, supra, at 352.

[40] *U.S. Underwriters Ins. Co. v. Zeugma Corp.*, 1998 WL 633679 (S.D.N.Y. Sept. 15, 1998).

from the inhalation of lead paint particles,[41] and (3) personal injuries resulting from a collision with a company-owned automobile on a public roadway.[42]

Notwithstanding the large number of decisions finding exclusion clauses applicable, courts have been reluctant to allow such clauses to be broadly interpreted. For example, in *United States Liability Ins. Co. v. Dehkterman*,[43] the driver of a van transporting children to and from a daycare center forgot a child on the bus, who later was found dead due to excessive heat inside the van. The child's parents sued the individuals operating the daycare center for negligence and wrongful death. The insurance company that had issued a liability policy to those individuals sought a declaratory judgment that it was not liable for or required to defend the claim, because of an exclusion clause precluding coverage for injury or damage "[a]rising out of the ownership, maintenance, use or entrustment to others of any . . . "auto" . . . owned or operated by or rented or loaned to any insured." While the damage clearly arose from the operation of an auto, the court found that the operative act did not fall strictly within the exclusion because under the facts the insured individuals neither owned, operated nor borrowed any automobile involved in the case. As such, the "but for" test would not apply to exclude the insured individuals' claims.

In sum, this Court must conduct a three-part analysis in determining whether the Inadequate Consideration Exclusion in the Policy is applicable and, thus, bars coverage.

---

[41] *Mount Vernon Fire Ins. Co. v. Jones*, 1997 WL 37033 (E.D.N.Y. Jan. 14, 1997).

[42] *U.S. Fire Ins. Co.*, 268 A.D.2d at 22.

[43] *U. S. Liability Ins. Co. v. Dehkterman*, 2002 WL 31780174 (E.D.N.Y. Oct. 4, 2002).

First, the Court must identify the specific type of harm or damage the plaintiffs in the Underlying Action claim to have suffered.  Second, the Court must apply the "but for" test by determining, based upon the alleged facts and without reference to plaintiffs' theories of liability, what specific act brought about the alleged harm, i.e., the operative act.  Third, the Court must determine whether the operative act is explicitly covered by the exclusion.   If the operative act is explicitly covered by the exclusion then the clause will exclude any claims that only arise because of that act.

      **C.**     **Application of the "But For" Test to the Inadequate Consideration Exclusion in This Case**

          **1.**     **The Specific Harm Suffered by the Plaintiffs in the Underlying Action**

As discussed above, plaintiffs in the Underlying Action assert eight causes of action related to the second restructuring plan.  First, they seek compensatory damages of approximately $110 million plus fees and costs against Delta Financial in favor of plaintiffs for Delta Financial's failure to fulfill its obligation under the Exchange Agreement to indemnify and hold harmless Delta LLC against loss.[44]  The loss of which they complain is the difference between the actual value of the Contributed Cash Flow Certificates and the value Delta Financial gave them, which they assert is approximately $110 million.

---

[44] The Court's analysis of the causes of action asserted by the plaintiffs in the Underlying Action is based upon the plain meaning of the allegations in the Second Amended Complaint.  As noted above, p. 23-24, supra, plain meaning is the starting point for interpreting all language being analyzed by a court, including that contained in complaints.

Second, they seek compensatory damages of approximately $500,000 plus fees and costs against Delta Financial in favor of plaintiffs for Delta Financial's breach of the Management Agreement. Plaintiffs allege that Delta Financial breached this obligation by failing to timely notify Delta LLC that Delta Financial had devalued comparable excess cash flow certificates owned by Delta Financial; and refusing to value the Contributed Cash Flow Certificates, which was necessary for Delta LLC to produce its interim and year-end reports and filings.

Third, they seek compensatory damages of approximately $110 million plus fees and costs as well as punitive damages against the Individual Defendants, jointly and severally, in favor of Delta LLC for fraud. More, specifically, plaintiffs assert that the Individual Defendants knew, as of August, 2001, that valuing the Contributed Cash Flow Certificates at $153 million was a gross overstatement or, in the alternative, that the Individual Defendants' representations as to the value of the Contributed Cash Flow Certificates were made with reckless disregard for the truth or falsity of those statements.

Fourth, based upon the actions set forth above, the plaintiffs seek a declaratory judgment that Delta LLC has a right under the Operating Agreement to redeem the Delta LLC Class C Membership Interests held by Delta Financial because "(a) [Delta Financial] has failed to meet its obligations under the Exchange Agreement and (b) [Delta Financial's] actions and omissions have materially and adversely affected Delta LLC." Plaintiffs do not seek any damages under the fourth count of the Second Amended Complaint.

Fifth, seek compensatory damages of approximately $110 million plus fees and costs against Delta Financial and the Individual Defendants, jointly and severally, in favor of plaintiffs for Delta Financial's and the Individual Defendants' negligent misrepresentation to Delta Financial that the value of the Contributed Cash Flow Certificates was $153 million.

Sixth, they seek payment of Delta LLC's attorneys fees in connection with the Underlying Action from Delta Financial based upon Delta Financial's anticipatory breach of the Exchange Agreement for Delta Financial's failure to indemnify and hold harmless Delta LLC against loss, i.e., the difference between the actual value of the Contributed Cash Flow Certificates and the value Delta Financial gave them, which they assert is approximately $110 million.

Seventh, plaintiffs seek compensatory damages of approximately $110 million plus fees and costs against the Delta LLC Directors, jointly and severally, in favor of Delta LLC for the Delta LLC Directors' breach of their fiduciary duties of care, good faith and loyalty in allowing the second restructuring transaction to proceed to closing while knowing that the value of the Contributed Cash Flow Certificates had been misrepresented.

Eighth, they seek compensatory damages of approximately $110 million plus fees and costs against Delta Financial in favor of Delta LLC for Delta Financial's breach of its fiduciary duties of care, good faith and loyalty to Delta LLC in allowing the second restructuring transaction to proceed to closing while knowing that the value of the Contributed Cash Flow Certificates had been misrepresented.

## 2. The Operative Act Giving Rise to the Claims Asserted in the Underlying Action

Having identified the specific type of harm or damage plaintiffs claim to have suffered, the Court must apply the "but for" test by determining, based upon the alleged facts and without reference to plaintiffs' theories of liability, what specific act or acts brought about the alleged harm. That determination is rather obvious from the above recitation. The operative act that brought about the alleged harm under each count of the complaint in the Underlying Action was the same – the closing of the second restructuring transaction whereby Delta LLC surrendered the Senior Notes and Senior Secured Notes with a face amount of $153 million to Delta Financial in exchange for the Contributed Cash Flow Certificates and other assets, which were worth approximately $110 million less than the exchanged debt.

The theories of liability vary, but the underlying cause of the alleged harm remains constant. Specifically, plaintiffs assert in the first and sixth cause of action that Delta Financial breached the Exchange Agreement by failing to indemnify and hold harmless Delta LLC against loss, i.e., the difference between the actual value of the Contributed Cash Flow Certificates and the value Delta Financial gave them, which they assert is approximately $110 million. Similarly, plaintiffs assert in the second cause of action that Delta Financial breached the Management Agreement by failing to timely notify Delta LLC that the value of the Contributed Cash Flow Certificates was not $153 million.

In the third and fifth causes of action, the plaintiffs seek damages for fraud and negligent misrepresentation, respectively, based upon the defendants' valuation of the Contributed Cash Flow Certificates at $153 million. In the seventh and eighth causes of action, the plaintiffs assert breach of the fiduciary duties of care, good faith and loyalty owed by the Delta LLC Directors and Delta Financial, respectively, for allowing the second restructuring transaction to proceed to closing while knowing that the value of the Contributed Cash Flow Certificates had been misrepresented to be worth $153 million. Finally, in the fourth cause of action plaintiffs seek a declaratory judgment that Delta LLC has a right under the Operating Agreement to redeem the Delta LLC Class C Membership Interests held by Delta Financial based upon the wrongs asserted in the first, third and fifth causes of action.

Thus, the causes of action asserted in the Underlying Action would not exist "but for" the closing of the second restructuring transaction whereby the Senior Notes and Senior Secured Notes worth $153 million were exchanged for the Contributed Cash Flow Certificates and other assets worth $110 million less.[45]

---

[45] Delta Financial argues that the operative act is Delta Financial's misrepresentation of the value of the Contributed Cash Flow Certificates. The Court disagrees. The misrepresentation of value is of no moment unless and until some action is taken in reliance upon that misrepresentation. Put another way, the plaintiffs in the Underlying Action suffered no harm until the Senior Notes and Senior Secured Notes were actually exchanged for the Contributed Cash Flow Certificates. While it may be possible for a cause of action to exist for misrepresentation even if the underlying transaction never occurs, there is no such allegation in this case. The plaintiffs in the Underlying Action assert misrepresentation as to value as a component of one or more of their causes of action but the operative act is the actual exchange of the notes and certificates and not the misrepresentation.

### 3. Whether the Operative Act Is Explicitly Covered By the Inadequate Consideration Exclusion

The Court must now determine whether the operative act is explicitly covered by the exclusion.[46] In analyzing the exclusion the Court must start and, if the contract is not ambiguous, end with the contract's plain meaning.[47] Nonetheless, an insurer seeking to invoke an exclusion clause to disclaim coverage bears the substantial burden of demonstrating that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.[48] Any doubt about the existence of insurance coverage should be resolved in favor of the insured.[49]

Analysis of the exclusion at issue in this case requires determining whether the closing of the second restructuring transaction in which the Senior Notes and Senior Secured Notes were exchanged for the Contributed Cash Flow Certificates was:

    i)   an actual payment

    ii)  by Delta Financial

    iii) of inadequate consideration

    iv)  in connection with Delta Financial's purchase

---

[46] This provision provides that:

> [t]he insurer shall not be liable for Loss on account of any Claim made against any Insured: … based upon, arising out of, or attributable to the actual or proposed payment by the Company of allegedly inadequate or excessive consideration in connection with the Company's purchase of securities issued by any company.

[47] *Fetner*, 741 N.Y.S.2d at 258.

[48] *U.S. Underwriters Ins. Co..*, 1998 WL 633679, *2.

[49] *Id*.

v)  of securities issued by any company.[50]

In each instance, the answer supports finding that the operative act is explicitly covered by the exclusion.

As with the determination of the operative act discussed above, this analysis is rather obvious.  Was the transfer of the Contributed Cash Flow Certificates by Delta Financial to Delta LLC an actual payment by Delta Financial?  Black's Law Dictionary defines "payment" as the "[p]erformance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation."[51]  The Contributed Cash Flow Certificates had some value, albeit less than $153 million. What's more they were transferred by Delta Financial and accepted by Delta LLC in full discharge of Delta Financial's obligations under the Senior Notes and Senior Secured Notes.  Thus, the transfer of the Contributed Cash Flow Certificates to Delta LLC constituted an actual payment by Delta Financial.

Were the Contributed Cash Flow Certificates inadequate consideration?  Black's Law Dictionary defines "inadequate consideration" as "[c]onsideration that is not fair or reasonable under the circumstances of the agreement."[52]  The payment of the Contributed Cash Flow Certificates in exchange for the Senior Notes and Senior

---

[50] Delta Financial cites *CNL Hotels* to argue that the application of the Inadequate Consideration Exclusion is limited to mergers and acquisitions and, thus, is not applicable. *CNL Hotels & Resorts, Inc. v. Houston Cas. Company*, 2007 WL 1363757 (M.D. Fla. May 8, 2007).  The Court disagrees.  *CNL Hotels* is not controlling because the exclusion in that case was significantly different from the terms of the Inadequate Consideration Exclusion.  The exclusion in *CNL Hotels* applied to "a Claim alleging that the price or consideration paid or proposed to be paid *in any transaction involving all or substantially all the ownership interest in or assets of an entity*." *Id*. at *2 (emphasis added).  There is no such limiting language in the Inadequate Consideration Exclusion.

[51] BLACK'S LAW DICTIONARY 1165 (8th ed. 2004).

[52] *Id*. at 326.

Secured Notes worth $110 million more than the certificates was clearly not fair or reasonable under the Offering Documents, which included: (a) the Exchange Agreement; (b) the Management Agreement; and (c) the Operating Agreement.

Was the actual payment by Delta Financial of the Contributed Cash Flow Certificates to Delta LLC, which constituted inadequate consideration, in connection with Delta Financial's purchase of securities issued by any company and does Delta Financial qualify as any company? Black's Law Dictionary defines "purchase" as "[t]he act or an instance of buying."[53] As defined in the Shorter Oxford English Dictionary "to buy" is to get "possession of by giving an equivalent, usu[ally] in money; obtain by paying a price; purchase."[54] Thus, the act of purchasing or buying does not require the payment of money or currency. In this case, Delta Financial did not pay money or currency for the Senior Notes and Senior Secured Notes. Rather, Delta Financial transferred the Contributed Cash Flow Certificates in exchange for the notes.

Similarly, Delta Financial's own Senior Notes and Senior Secured Notes, which it obtained through the second restructuring transaction clearly constitute "securities issued by any company." There can be no question that notes are securities.[55] As there is also no legitimate question that Delta Financial must be included in the meaning of "any company," the exchange of the Senior Notes and Senior Secured Notes for an

---

[53] *Id*. at 1270. *Compare Id.* at 213 ("**buy**. See Purchase.") (emphasis in original).

[54] I Shorter Oxford English Dictionary 319 (6th ed. 2007).

[55] See Black's Law Dictionary 1384 - 85.

"equivalent," i.e., the Contributed Cash Flow Certificates, constituted a purchase of securities issued by any company.

### 4. Conclusion

In sum, the Inadequate Consideration Exclusion at issue acts to bar coverage under the Policy for the defendants in the Underlying Action. In applying the "but for" test, the Court has determined that the causes of action asserted in the Underlying Action would not exist "but for" the operative act, which was the closing of the second restructuring transaction whereby the Senior Notes and Senior Secured Notes worth $153 million were exchanged for the Contributed Cash Flow Certificates and other assets worth $110 million less. The Court has further found, based upon the plain meaning of the Policy and notwithstanding that any doubt about the existence of insurance coverage should be resolved in favor of Delta Financial, that the operative act in this case is explicitly covered by the Inadequate Consideration Exclusion. Thus, there is no coverage under the Policy for the defendants in the Underlying Action.

### III. Based Upon The Absence Of Coverage Under The Policy For The Defendants In The Underlying Action, The Complaint In This Case Must Be Dismissed.

Through this adversary proceeding Delta Financial seeks a declaration that the Insurers are required to provide coverage for defense costs and indemnification in connection with the Underlying Action. In addition, Delta Financial seeks compensatory and punitive damages related to Westchester's denial of coverage. The defendants have moved to dismiss the complaint based upon a number of theories but primarily on the basis that the Inadequate Consideration Exclusion acts to bar coverage

under the Policy for the defendants in the Underlying Action. Construing Delta Financial's allegations in the light most favorable to it, the Court agrees with the defendants and will dismiss the complaint in the adversary proceeding.

### A.    All The Asserted Counts Must Be Dismissed

Most of the counts asserted in the complaint are clearly barred by the Court's conclusion that there is no coverage under the Policy for the defendants in the Underlying Action. Specifically, counts 1, 2, 3, 6, 7 , 8 and 9 all seek a declaration that one or more of the insurers must provide coverage for defense costs and indemnification for one or more of the defendants in the Underlying Action. As such, these counts must be dismissed.[56]

Delta Financial also asserts a claim against Westchester in Count 4 for breach of contract arising from Westchester's wrongful denial of coverage under the Policy. As there is no coverage under the Policy, there can be no breach of contract for denying said coverage.

In Count 5, Delta Financial asserts a claim for breach of the covenant of good faith and fair dealing against Westchester. Delta Financial alleges that Westchester unreasonably and in bad faith failed to timely issue a coverage position by waiting 18 months to decide to deny coverage under the Policy even though Westchester was in possession of sufficient facts and information to make that decision. Delta Financial also alleges that it reasonably relied on Westchester's silence by incurring fees and costs

---

[56] Delta Financial has argued that the defendants have either waived the right to assert or are estopped from asserting that the Inadequate Consideration Exclusion bars coverage under the Policy for the defendants in the Underlying Action. That argument is addressed at pp. 40-42, infra.

in connection with the Underlying Action with the expectation it would be afforded full coverage under the Policy. Importantly, Delta Financial does not seek compensatory damages under this count but rather only seeks punitive damages and pre-judgment interest.

As there is no coverage under the Policy, there can be no breach of the covenant of good faith and fair dealing for denying said coverage. The Court understands Delta Financial's claim to be somewhat different, however. Delta Financial argues that, regardless of whether there is coverage, Westchester breached the covenant of good faith and fair dealing by waiting 18 months to decide to deny coverage under the Policy. This distinction is irrelevant. Regardless of whether there is a claim under New York law for bad faith denial of insurance coverage,[57] there cannot be a claim for a bad faith delay in denying insurance coverage when coverage actually does not exist. To rule otherwise, would be to provide a claim to an insured that has no basis to assert coverage. That would be an absurd result.

Moreover, regardless of whether this distinction is legitimate, Count 5 must be dismissed because punitive damages (which are the only remedy sought under this count) for breach of contract "are available only in those limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as

---

[57] Accord *New York University v. Continental Ins. Co.*, 639 N.Y.S.2d 283 (N.Y. 1995); and *Bi-Economy Market, Inc. v. Harleysville Insurance Company of New York*, 10 N.Y.3d 187 (N.Y. 2008).

to imply a criminal indifference to civil obligations.'"[58]  There are no allegations in Delta Financial's complaint asserting that Westchester engaged in such conduct and, thus, punitive damages are unavailable as a matter of law.[59]

### B. The Defendants Have Not Waived The Right To Assert That The Inadequate Consideration Exclusion Is Applicable

In paragraphs 40 and 41 of Delta Financial's complaint it asserts that because of Westchester's bad faith delay in deciding to deny coverage the Insurers have waived the right to assert that certain exclusions, including the Inadequate Consideration Exclusion, bar coverage.[60]  As a matter of New York law, however, an insurer cannot waive a defense to coverage.

In *Albert J. Schiff Associates, Inc. v. Flack*, the New York Court of Appeals began its analysis with the proposition that "coverage under the policies in this case is not merely what is found under the heading 'insuring agreement.'  Just as this clause affirmatively indicates the coverage which is included, so does the 'exclusion' clause tell us expressly what is not… …it is not either alone, but the combination of both, which defines the

---

[58] *New York University*, 639 N.Y.S.2d at 287 (citing *Rocanova v. Equitable Life Assur. Socy.*, 612 N.Y.S.2d 339 (N.Y. 1994)).

[59] Delta Financial cites to the dissent in *Bi-Economy Market, Inc.* to argue that punitive damages are available based upon the facts alleged in this case. *Bi-Economy Market, Inc.*, 10 N.Y.3d at 197.  The majority in *Bi-Economy Market, Inc.*, however, did not alter the standard for asserting punitive damages set forth in *New York University* and *Rocanova. Id.* at 193.

[60] Paragraphs 40 and 41 do not specifically reference the Inadequate Consideration Exclusion.  Rather they reference Exclusion A(10), i.e., the Director Exclusion, and Insuring Clause C.  Nonetheless, the Court will consider Delta Financial's waiver arguments to be applicable to the Inadequate Consideration Exclusion.

scope of the protection afforded no more and no less."[61]  From this, the court further concluded:

> for the insured to extend its coverage to more than it originally bargained, it would have had to enter into a supplemental contract expanding the insuring clause or contracting the exceptions. However, this extension of coverage cannot be attained by waiver, which is a voluntary and intentional relinquishment of a known right.[62]

Finally, the court further concluded, "where the issue is the existence or nonexistence of coverage (e.g., the insuring clause and exclusions), the doctrine of waiver is simply inapplicable."[63]  Thus, the Insurers have not waived the argument that the Court has found persuasive, i.e., there is no coverage under the Policy for the defendants in the Underlying Action.

### C.   The Defendants Are Not Estopped From Asserting That The Inadequate Consideration Exclusion Is Applicable

In paragraphs 40 and 41 of Delta Financial's complaint it also asserts that because of Westchester's bad faith delay in deciding to deny coverage the Insurers are estopped from asserting that certain exclusions, including the Inadequate Consideration Exclusion, bar coverage.[64]  Under New York law, "[a]n estoppel 'rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury'"[65]

---

[61] *Albert J. Schiff Associates, Inc. v. Flack,* 51 N.Y.2d 692, 697 (N.Y. 1980).

[62] *Id.* at 698.

[63] *Id.*

[64] Once again, Paragraphs 40 and 41 do not specifically reference the Inadequate Consideration Exclusion. Nonetheless, the Court will consider Delta Financial's estoppel arguments to be applicable to the Inadequate Consideration Exclusion.

[65] *Nassau Trust Co. v. Montrose Concrete Products Corp.,* 56 N.Y.2d 175, 184 (N.Y. 1982).

Delta Financial fails to allege facts sufficient to establish estoppel. First, Delta Financial fails to show how it changed its position in reliance on Westchester's failure to issue a coverage position. Delta Financial states that it relied on Westchester's silence and "defended itself vigorously against the [Underlying Action] with the full expectation that it would be afforded full coverage under the D&O Policy." Delta Financial fails to assert how it changed its position. How would Delta Financial have acted differently if Westchester had timely disclaimed coverage?

Similarly, Delta Financial fails to assert how it was injured by Westchester's delay. For eighteen months it defended itself vigorously in the Underlying Action. But, even if it expected Westchester to indemnify it for any "Losses," how was it injured by defending itself? There are no allegations in the complaint answering these threshold and critical questions.

Finally, under New York law a party cannot support a claim for estoppel with a simple allegation that the insurer unreasonably delayed it disclaimer of coverage.[66] Thus, the Insurers are not estopped from asserting there is no coverage under the Policy for the defendants in the Underlying Action.

### IV. This Adversary Proceeding Is a Non-Core Matter

Westchester also filed a motion for determination that this adversary proceeding is a non-core proceeding as well as a motion requesting the district court to withdraw

---

[66] *American Home Assur. Co. v. Republic Ins. Co.*, 984 F.2d 76, 79 (2d Cir. 1993) ("only where prejudice as a result of the unreasonable delay is shown by adequate proof is the insurer estopped from asserting noncoverage.").

the reference of this adversary proceeding.[67]  The Court agrees with Westchester's that the adversary proceeding is non-core.

This adversary proceeding is the continuation of a pre-petition dispute between Delta Financial and the Insurers over whether the Insurers are required to provide insurance coverage for defense costs and indemnification in connection with the Underlying Action.  As such, it is virtually identical to the dispute recently addressed by Judge Walsh in *In re Stone & Webster, Inc.*[68]

In *Stone & Webster*, a dispute arose prior to the bankruptcy filing between the debtors and their insurer, Century, over whether Century had a duty to defend and indemnify the debtors in connection with certain environmental claims.  Century refused to provide coverage both before and after the bankruptcy filing.  Ultimately, the debtors settled the environmental claims post-petition.  The debtors then brought an action against Century seeking, among other things, a declaratory judgment that Century had a duty to defend the debtors in connection with the environmental claims or to compensate the debtors for their reasonable costs of defending such claims.

The Court in *Stone & Webster* ably summarized the law governing the determination of whether a matter is core proceeding.

> Section 157(b) does not define what a "core proceeding" is, but it does provide a non-exclusive list of types of proceedings that are "core." Courts have used various tests and standards to determine whether a proceeding is core, some of them much narrower than others.  Under the prevailing standard in the Third Circuit, a court must first determine if a

---

[67] U.S. Fire and Axis joined in these motions.  The motion to withdraw the reference is pending in the district court.

[68] *In re Stone & Webster, Inc.*, 367 B.R. 523 (Bankr. D. Del. 2007).

proceeding fits into one of the categories of core proceedings given in § 157(b)(2). If it does not, the court must apply the following test: " 'a proceeding is core [1] if it invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case.' " A core proceeding "must have as its foundation the creation, recognition, or adjudication of rights which would not exist independent of a bankruptcy environment although of necessity there may be peripheral state law involvement." On the other hand, courts generally find that state law causes of action brought by or on behalf of the debtor, which do not fall within the provisions of 28 U.S.C. § 157(b)(2)(B)-(N), are non-core matters. [69]

The Court also noted that courts consider the time period in which the underlying claim arises and the economic benefit a claim can provide to the estate if it is successful in determining whether a proceeding is core.[70]

The Court in *Stone & Webster* found that the coverage dispute before it was a non-core matter. In so finding the Court noted that no substantive rights under the Bankruptcy Code were implicated, the proceeding could exist outside of the debtors' bankruptcy cases, and the claim arose pre-petition. The last finding was particularly significant as it served in and of itself to distinguish the bulk of the cases cited by the debtors in support of its argument that the proceeding was a core matter. Finally, the Court noted that, in the Third Circuit, the fact that a claim may provide economic benefit to the estate does not factor into the determination of whether a claim is core.

The decision in *Stone & Webster* is directly on point. In this case, the proceeding does not fall within the categories set forth in 28 U.S.C. §157(b)(2), no substantive rights under the Bankruptcy Code are implicated, the proceeding could exist outside of the

---

[69] *Id.* at 525-26 (internal citations omitted).

[70] *Id.* at 526-27.

Delta Financial's bankruptcy case, and the claim arose pre-petition. Delta Financial asserts that this proceeding is a core matter because the claim for defense costs and indemnification is of central importance to the estate, but that argument is irrelevant under Third Circuit law.

The Court's summation of its holding in Stone & Webster is equally applicable to this case:

> At its root, this proceeding is a plain breach of contract claim governed by state law. Pre-petition state law contract claims are precisely the type of claim that the Supreme Court held could not be decided by non-Article III judges in *Northern Pipeline*."

## CONCLUSION

Delta Financial brought this action seeking a declaration that the Insurers are required to provide insurance coverage for defense costs and indemnification in connection with the Underlying Action. The Insurers sought to dismiss the complaint based, among other things, upon the Inadequate Consideration Exclusion in the Policy.

To determine whether the Inadequate Consideration Exclusion bars coverage the Court applied the "but for" test under which the Court determined that the causes of action asserted in the Underlying Action would not exist "but for" the operative act, which was the closing of the second restructuring transaction whereby the Senior Notes and Senior Secured Notes worth $153 million were exchanged for the Contributed Cash Flow Certificates and other assets worth $110 million less. The Court further found, based upon the plain meaning of the Policy and notwithstanding that any doubt about the existence of insurance coverage should be resolved in favor of Delta Financial, that

the operative act in this case is explicitly covered by the Inadequate Consideration Exclusion.  Thus, the Court found that there is no coverage under the Policy for the defendants in the Underlying Action.

As most of the counts asserted in the complaint are clearly barred by the Court's conclusion that there is no coverage under the Policy for the defendants in the Underlying Action, those counts must be dismissed.  The remaining counts asserting breach of contract and the covenant of good faith and fair delaying arising from Westchester's bad faith delay in denying coverage must also be dismissed.  Finally, the Court finds that the Insurers did not waive the right nor are they estopped from asserting that the Inadequate Consideration Exclusion is applicable.  Thus, the complaint must be dismissed in its entirety.[71]

In addition, Westchester filed a motion for determination that this adversary proceeding is a non-core matter.  Based upon the application of the holding in *In re Stone v. Webster* to the facts of this case, this Court finds that this is a non-core matter.

An order will be issued.

---

[71] The Insurers raise a number of additional arguments in support of dismissal. See pp. 20-21, *supra*.  The Court has not addressed these arguments as it is unnecessary to dispose of the motions.  Thus, the Court offers no opinion on the merits of those arguments.